George W. PONCY, Theodore Morris, Jr., Rick B. Vernois and Alfred Moss

v.

JOHNSON & JOHNSON.

G. W. PONCY, INC. and Steridyne, Inc.

v.

JOHNSON & JOHNSON.

Civ. Nos. 76–1150, 77–703.

United States District Court, D. New Jersey.

May 18, 1978.

Furthermore, *Caplan* involved exemptions 2 and 7(E) which sections do not require a balance of competing policies.

Carella, Bain, Gilfillan & Rhodes, P. A., Newark, N. J., for plaintiffs; Smathers & Thompson by G. Morton Good, Miami, Fla., of counsel.

Smith, Statton, Wise & Heher by Arthur S. Lane, Princeton, N. J., for defendant; Patterson, Belknap, Webb & Tyler by Thomas C. Morrison and Russell C. Deyo, New York City, of counsel.

## OPINION

BIUNNO, District Judge.

In these consolidated cases, Johnson & Johnson asserts counterclaims against plaintiffs in connection with a trademark dispute. These claims are asserted in the Second and Third Counterclaims in Civ. 76–1150, and in the First and Second Counterclaims in Civ. 77–703. The same issues are embraced by the demand for declaratory judgment in the complaint in Civ. 77–703.

This aspect of the consolidated cases came on for hearing on Johnson & Johnson's motion for preliminary injunction, with trial on the merits advanced and con-

solidated with the hearing on the application, under F.R.Civ.P. 65(a)(2).

At the time the application first came on, it appeared that the taking of testimony would likely involve more time than could be fitted in with continuous hearings, because of the top priority commanded for criminal trials under the Speedy Trial Act. The court accordingly suggested that the parties accumulate as much material as possible through document discovery and depositions, and also undertake to prepare a joint statement of facts not in dispute. These steps were taken and were of considerable aid to the parties and the court by enabling the record to be completed in much less time than would otherwise have been possible, aided by the premarking of a large number of exhibits.

This cooperative procedure also turned out to avoid what might have been a very long delay, because the court became engaged in a multi-defendant criminal trial that began in mid-January and did not end until very late April, 1977 (unfortunately with a jury disagreement and a mistrial).

To avoid the confusion that would arise from references to "defendants-counterclaimant", and to "plaintiffs-counterclaim defendants" on these trademark and unfair competition issues, the claiming party, Johnson & Johnson, will be referred to as * J & J. The plaintiffs-counterclaim defendants will be referred to as * PONCY.[1]

One segment of * PONCY, a number of individuals, had acquired ownership of a number of patents dealing with a "thermometer sheath". This is a device made up of several layers of flexible, translucent plastic sheet material, fabricated to fuse the sheets with an impressed form, shaped with a die, in a width and length such that a typical fever thermometer can be inserted. The tip end, where the mercury thermometer bulb would rest, is closed. The other end, through which the thermometer is inserted, has a flared shape, somewhat like

---

[1]. Abbreviations or names which may be trade-names, trademarks or corporate names, or parts thereof, are designated throughout by an asterisk to avoid any risk of loss of property interests to any of the parties.

the bell of a trumpet, to make insertion easier (i. e., the "throat".)

The object of the product is to provide a covering, for one-time use and then discarded, for fever thermometers. It represents an attempt to deal with well-known problems of cross-contamination (from one patient to another, or from working staff to a patient), and self-contamination or re-infection (from the same patient to himself), mainly in hospital environments. Obviously, in such an environment, the very fact that the occupants served are patients who are ill or disabled by one or another ailment, condition or disease brings about a high concentration of such persons in one location, and necessarily gives rise to a greater risk that one patient will "catch" something from another especially since some number, being ill, will have a lower resistance to disease than if in robust, good health.

The standard mercury-filled glass thermometer is the major instrument in use for taking body temperature which, in turn, is one of the measurements needed by the medical staff (along with pulse, respiration rate, blood pressure and other measurements) to gauge the status and progress of a patient's condition of illness and recovery, as well as being a diagnostic tool.

Surgical instruments, bandages, surgical gowns, caps, masks and gloves, along with other implements and consumable items, can be "sterilized" by relatively simple means of known reliability. When "sterilized", these items are free of any living matter whether bacteria, spores, fungus or other kinds.

Glass thermometers are not easily sterilized. The autoclave, with its high-temperature moist steam, reaches temperatures far above those that the fever thermometer is designed to withstand; it would break.

Strong sterilizing chemicals, such as carbolic acid, while useable, are also highly toxic substances which must be completely removed. Radiation methods for sterilization have the effect of discoloring the glass of the thermometer and thus obscure the reading. Ethylene Oxide gas is effective but also has disadvantages because of the length of exposure time required, and additional time for decontamination of the gas.

These matters, many of which were discussed in the testimony, and others of which appeared in articles or chapters from technical publications or books referred to at the hearings, provide the background or context for understanding the concept and purpose of the thermometer sheath. None of these items is seen to be in dispute.

The concept of the plastic thermometer sheath is to cover the glass thermometer with a new, unused sheath each time the thermometer is used. In principle, the plastic covering would provide a barrier between the thermometer and the patient such that it would not matter that the thermometer is not sterilized.

This idea, in and of itself, is so obvious that despite whatever merit is might have it probably would not be patentable as such. Besides, merely providing a plastic cover would be meaningless if the cover itself had to be handled because then the cover would become a medium for the transmission of microorganisms.

The theme of the patents, then, is directed to the design of the plastic cover in such a way that the tube portion covering the thermometer does not need to be handled by anyone after packaging and sterilization. The details by which this goal is sought to be achieved will be discussed in detail further on.

In any event, the individuals forming part of * PONCY acquired the batch of patents (each owning one or another share, and referred to as "Rightsholders") undertook to reap the benefits of the patents by arranging to have the sheaths manufactured and marketed (mainly to institutional buyers) through a * PONCY corporation known as "Steriseal".

As the product gained some awareness, discussions took place between * PONCY and * J & J. These discussions ultimately led to the drafting and execution of an option agreement under which * J & J would have a period of time in which to

evaluate the product in all respects, including test-marketing. During that period, it could exercise the option and thereby acquire all tne patents (from the Rightsholders), the manufacturing machinery, "know-how", customer lists and trademark (from the * PONCY "Steriseal" corporate entity).

If the option were exercised, then at closing certain payments, totalling some $200,-000, would be made, and royalties based on volume of sales but with a specified minimum, would be payable thereafter. There was also provision that if, for any year, * J & J did not pay the minimum royalty, the Rightsholders in the * PONCY group could demand reassignment of the patents, without refund of any of the purchase payments, and with * J & J retaining a non-exclusive license to use the patents. In that eventuality, there was no requirement that * J & J return the machinery, "know-how", customer lists or trademarks.

The option agreement was entered into on September 14, 1971. Among the assets covered by the option were the trademarks * STERITEMP (the trademark involved in this suit) and * DRI–KIT, although the record discloses that * STERITEMP was not registered by Steriseal on the Principal Trademark Register of the U. S. Patent Office until November 23, 1971 some two months after the option agreement.

The evidence is clear and beyond dispute that preliminary evaluation of the product was made by * J & J during the discussion and negotiation stage preceding the September, 1971 option. In that period, it was decided that if the option agreement were made, the trademark * STERITEMP would not be used by * J & J for its test-marketing purposes. There were two reasons for this. One was that * PONCY was still making and marketing its sheath, and was free to continue to do so during the option period, with the trademark * STERITEMP. The second reason was that although * PONCY had been selling with a claim that the product was "sterile until seals are broken", the preliminary evaluation by * J & J raised doubts that this claim could be made legitimately as the product then ex-

isted. Even without the express claim on each sheath, the trademark * STERITEMP implied sterility.

The decision made was to use the trademark * J–TEMP, which fitted in with other product branding through the use of one of * J & J's initials, and the suffix –TEMP, a unit also used for * TEMP–A–STRIP, * MEDITEMP and * TEMPS, which are other * J & J products.

It was hoped that the doubts in regard to sterility could be resolved and met, since this would also fit in with other trademarks such as * STERI–PAD, * STERIPAK, * STERICON, * STERI–FLEX and * STERI PRET, for products in the * J & J line.

Following an extension of the option period, * J & J exercised the option on December 26, 1972. In connection with the transaction various payments were made to * PONCY. For the option itself, $75,000 was paid in 1971. In 1972, $25,000 was paid for the option extension; $50,000 as prepaid royalties for the option period; $47,252 for the manufacturing machinery; $75,000 as the first installment on exercise of the option; and $50,000 as further prepaid royalties. In 1973, another $50,000 was paid as prepaid foreign royalties and $75,000 for the second installment on the exercise of the option. In 1974, $50,000 was paid for the final installment. These payments total $507,252, and of this total $110,000 was for the option and its extension, $200,000 was for exercise of the option, $47,252 was for machinery, and $150,000 was for prepaid royalties (domestic and foreign).

After exercise of the option and purchase of the patents, * J & J was entitled to retain the exclusive right to the U. S. patents so long as royalties amounted to specified minimums. If the royalties did not reach the minimum, and if * J & J did not pay the minimum anyway, then those persons in * PONCY who were the Rightsholders of the patents were entitled to have the patents reassigned to them, subject only to a non-exclusive license in * J & J.

This is what actually happened in 1975. The minimum royalties were not reached

for 1974, * J & J was unwilling to pay the minimum anyway, the * PONCY Rightsholders asked for reassignment of the patents and they were formally reassigned to them subject to the non-exclusive license. No refund of payments previously made was called for, and none was made. Reassignment of only the patents was called for, and that is all that was reassigned. * J & J retained the machinery, the "know how", the trademark * STERITEMP, the good will and the customer lists.

From this much of the history, none of which is seen to be a matter of disagreement, no issue for litigation appears. The trademark litigation arises from collateral activities.

From the very start, * J & J arranged to have the * PONCY corporation, Steriseal, manufacture the sheaths for it. Along the way (and the dates are not significant), Steriseal, which had been in New Jersey, was dissolved; Mr. Poncy, Sr. moved to Florida and formed a new company, Steridyne, which continued to manufacture * J & J's requirements for the sheaths. In early 1976, * J & J decided to have its sheaths made by another manufacturer, which it was free to do. Nothing in the option agreement or other agreements between * J & J and * PONCY placed any obligation on * J & J to obtain its sheath requirements from * PONCY. It was free to make them itself, or to contract for their manufacture with whomever it chose. It is for this reason that this line of the history is found to be collateral.

Soon thereafter, the Steridyne and another Florida company in the * PONCY group began marketing and selling the same sheaths, made from the same machinery and under license of the same patents from the Rightsholders, under the trademark * STERITEMP, which was among the assets sold to * J & J and retained by it when the patents only were reassigned to the Rightsholders in * PONCY. Hence, this trademark litigation.

The legal issues are straightforward. * PONCY says that * J & J abandoned the trademark. It points to 15 U.S.C. § 1127(a).

That act says two things: one, it says that a trademark is deemed abandoned when its use is discontinued "without intent to resume" its use. Two, it says that proof of non-use for two consecutive years constitutes *prima facie* evidence of abandonment. * J & J counters that the evidence shows no actual intent to abandon, pointing to *Saxlehner v. Eisner & Mendelsohn Co.*, 179 U.S. 19, at 31, 21 S.Ct. 7, 45 L.Ed. 60 (1900) as well as to consistent later decisions in the lower courts following that case (as they are bound to do).

Next, * PONCY claims that a bare trademark cannot be transferred; there must be a transfer of both the trademark and the good will associated with it. It points out that * J & J decided to use the trademark * J–TEMP for the sheaths, instead of the trademark * STERITEMP which had been associated with the sheath by * PONCY by its manufacture and sales before the option was exercised. This, it claims, shows that * J & J abandoned the good will even before exercising the option, and that what it really acquired was the bare trademark; which cannot be done. * J & J replies that it did acquire the good will (the assignment so states), and that there is no requirement that the trademark be used on precisely the same product for which it was used at the time of the assignment. It is also noted that the package of assets included * PONCY'S customer lists, and that these are part of the good will and were in fact used.

Finally, * J & J claims that * PONCY is estopped in any event from contesting * J & J's right to * STERITEMP. For whatever it was worth, * PONCY sold the trademark to * J & J in the package of assets, was paid in full for all the assets, and cannot, in equity and good conscience retake unilaterally that which was sold by direct agreement between the parties.

Federal jurisdiction on the counterclaims of * J & J arises out of the Lanham Act, 15 U.S.C. §§ 1051 to 1127, and under 28 U.S.C. § 1338. Pendent jurisdiction is asserted for the claims grounded on breach of contract, unlawful misappropriation of property and unfair competition as well as federal juris-

diction grounded on diversity under 28 U.S.C. §§ 1332. The remedy of declaratory judgment arises from 28 U.S.C. § 2201 and § 2202, with the jurisdictional basis being the same as has been already noted.

There is no fact issue here of confusing similarity or the like for the sheath; * STERITEMP, as it is being used by * PONCY is identical to the trademark sold and assigned to * J & J. In the area of unfair competition, there is a fact issue of confusing similarity in view of the various trademarks, other than * STERITEMP, owned and used by * J & J for products associated with it as the origin, using * STERI or * TEMP in combination with other prefixes or suffixes. This aspect also involves the matter of dilution of the value of such other marks, unquestionably owned by * J & J.

There is no fact issue about the right of both * J & J and the * PONCY group to manufacture and market plastic thermometer sheaths based on the group of patents involved, and no issue of infringement or validity. Having retained a non-exclusive license, * J & J is free to use the patents. As owners of the reassigned patents, the Rightsholders are free to license * PONCY to manufacture and sell sheaths as well, in competition with * J & J.[2]

The fact issue, then, resolves itself into one of the intent of * J & J. As the statute says, has the use been discontinued without intent to resume? * J & J says it has every intent to resume use of the trademark, and points out that its non-use is due to doubts that it could properly use it in conjunction with the * PONCY product.

The evidence dealing with * J & J's reluctance to make the express claim "sterility guaranteed until seals are broken or damaged", or the implied claim arising from the prefix * STERI–, was felt to call for some factual and technical background or context to understand the significance of such claims. This was provided by Exh. C–1 and C–2. Exh. C–1 consisted of the Vol. 3, No.

1 issue of the "Journal of Hospital Research", January, 1965 (Erie, Pa.) Exh. C–2 consisted of pp. 119–125 of Chapter 8, and pp. 150–161 of Chapter 9, of Zinsser, "Microbiology", 13th Ed. (New York, 1964). Neither side objected to the taking of judicial notice of the tenor of the material in these sources.

They indicate that the many kinds of microorganisms are classified by various characteristics and by the relative ease or difficulty with which they may be killed, as well as by the number of available materials or methods that can be used. Evidently, the "vegetative bacteria" are the easiest to kill, and the "bacterial spores" are the most difficult, with "lipid viruses", "non-lipid viruses," "fungi" and the "tubercule bacillus" falling between.

An inanimate object, such as a thermometer, a sheath, a scalpel, a catheter, and the like, is said to be "sterile" when it is completely free of any kind of living microorganism. For this purpose, germicidal liquids or gases, as well as various forms of energy, such as heat, ultraviolet light and ultrasonic vibrations, may be used, the selection depending on a variety of applicable circumstances.

The word "disinfect" is used in connection with the substantial cleaning or killing of microorganisms, but short of sterilization, of the general environment, such as walls, floors, furniture and air ducts. The word "antiseptic" refers to similar agents or methods used to clean surfaces of the human body itself, such as the swabbing of the skin with alcohol, before inserting a hypodermic needle. This, too, falls short of sterilization since what would be needed to sterilize would also destroy human tissue.

It also appears that the human body and its environment, including inanimate objects, are heavily populated by all manner of microorganisms to such a pervasive extent that their presence must be assumed in the absence of means and methods known to assure sterility

---

**2.** In the first license to * PONCY after reassignment of the patents, the Rightsholders explicitly referred to the trademark * STERITEMP, the record title of which was retained by * J & J. This was replaced by a new license which omitted any reference to the trademark.

* J & J's reluctance to make express or implied sterility claims arose from a variety of considerations. One was that the package, as designed, left the interior of the sheath (where the thermometer is inserted) open at the throat, so that microorganisms could enter there and lodge within the sheath. Although a non-sterile thermometer would be eventually inserted, the court cannot find that it was irrational to be reluctant on this ground. This is because a non-sterile interior could introduce microorganisms of its own, aside from those introduced by inserting the thermometer. This is a valid, if strict, view warranting a reluctance to claim sterility of the product. The contrast is, for example, with the * BAND–AID package, which is entirely closed and which, after sterilization in the manufacturing process, can be guaranteed to remain sterile until the package is opened or damaged.[3]

Of course, every sterilized article becomes non-sterile when put to a non-sterile use, but the point of the sterility claim, when valid, is that the sterilized article can be relied on not to add any microorganisms to the environment where it is put to use.

The second aspect influencing the reluctance to make the claim is that the sides and tip end of the sandwich making up the package also were not sealed, so that it would have to be assumed that microorganisms could enter and lodge there. This assessment, of itself, was not challenged but it was argued that it was irrational because any microbes in the area beyond the seal line could not migrate past the seal to the surface of the sheath itself as finally formed by peeling back the paper covers. Assuming the seal line to be such a barrier, the fact remains that the very process of peeling and tearing introduces mechanical forces that could themselves transfer microbes from an area beyond the seal line to an area within it. This would be very similar to the criticism, made by * PONCY in its own literature, of the design of a competitor's sheath. That sheath is wholly enclosed in sealed paper (except for the throat), and after inserting the thermometer the paper envelope is torn by twisting near the bottom, and the larger part removed by slipping it off the sheathed thermometer. The criticism made was that in slipping off the envelope, microorganisms properly assumed to be present on the outside surface of the paper could be lodged on the previously sterile outer surface of the sheath. This could only be by mechanical forces, not unlike those involved in stripping and tearing the seal line.

When this concern was first mentioned, early in the discussions, Mr. Poncy said it could be met by providing a second seal line parallel to and outside the existing one. He made a die for this purpose and some samples, but the method so proposed was not used. The testimony also brought out that Mr. Poncy's double seal die did not overcome this concern because the outer seal was not brought back to join the first, thus leaving two openings through which microorganisms could migrate and lodge on the surfaces of the area forming the band between the two seals.

From all the testimony on this point, the court is satisfied that each side had entirely different subjective notions, presumably both sincerely held. Mr. Poncy had felt no reason not to claim sterility when he marketed the product; he no doubt regarded the concern as trivial, and his effort to overcome it seems to have been more super-

---

**3.** * PONCY sought to establish through the witnesses that this objection, as well as others going to the packaging, could have been established easily by applying the double "druggist's fold" or "butcher's fold" to the throat (and perhaps to the end and sides). The evidence did not establish that this was so. Trial of the method (which was demonstrated by counsel) disclosed that double-folding the throat end made it more difficult and inconvenient to insert the thermometer. Folding of the tip end interfered with the attachment of the sheath to the cover papers, sometimes rupturing the attachment. Both called for considerably more handling of the package with ensuing increase in the risk of contamination. Double folding of the sides is not feasible because the entire width of the unit is too narrow for this purpose. Beyond that the need to apply these or other means suggests that a packaging system different than that called for by the patents would be needed.

ficial than serious. Also, it is judged that it made little difference to him whether sterility was claimed or not, so long as the sale went through and royalties were paid.[4]

But the test is not what Mr. Poncy's subjective notion of the concern was. It is whether * J & J's concern, viewed objectively, was a reasonable one sufficient to warrant its reluctance. In light of the nature of the subject (presence and transfer of invisible microorganisms) and the evidence establishing the extent to which full enclosure is provided for other products sold on guarantee of sterility, it was not unreasonable to be reluctant.

The third concern arose after the first two and was regarded as of such weight as to sidetrack further attention to them. This had to do with the so-called "leaker" problem. While the record is not entirely clear about how this problem first arose, it seems that periodic tests of sheaths were made by subjecting them to air pressure to see if there were leaks. Microbiological tests were also made. The results of the two kinds of tests disagreed. The air tests did not show leaks, while the other tests did.

The question was explored with Mr. Poncy, who felt the problem might be due to unavoidable pinholes in the thin plastic sheets, and suggested that double ply plastic be used instead, which would essentially eliminate the chance that a random pinhole on one ply would coincide with one on the other ply. Some samples were made, and large sheets checked and found to apparently meet the pinhole aspect, but then attention on the source of the leaks was directed to the torn seal line itself, rather than pinholes in the plastic sheets. With this aspect still open, the design was not changed to 2-ply or laminated plastic. Obviously, the material cost for plastic would be doubled,

and either would not solve matters if the cause was at the tear line of the seal, or else it was felt that a sterility claim would not generate enough additional sales to warrant the added cost, or both.

At Mr. Poncy's urging, arrangements were made to engage Bertha Litsky, a microbiologist, to conduct a series of tests. Without detailing them here, the results indicated that the use of a plastic sheath was superior, in terms of exposure of a hospital patient to cross-contamination or re-infection. It also showed that microorganisms did in fact migrate from the thermometer outward through the tear line of the seal on some samples.

The precise nature of the cause of such leakage has evidently not been successfully tracked down. From the testimony and exhibits in the case, from the court's close inspection of the sheaths themselves, carefully peeled without tearing and peeled with tearing, it is probable that the cause is attributable to the process of tearing the plastic along the line of the seal.

The nature of the process of tearing or breaking an article is well-known and is common knowledge. Some materials have a "grain", and will tear or break along the grain with a degree of regularity, but will tear or break very irregularly against the grain. Everyone who has tried to tear an article from a newspaper has found that it can be torn on a reasonably straight line in one direction but that the tear line meanders widely when tearing at right angles. Wood is easily split with the grain, but if broken against the grain, shows great irregularities.

Materials like glass or plastic sheets are essentially grainless and will break or tear irregularly. The common experience with the thin plastic sheets used as refrigerator wraps illustrates this fact.

---

4. * J & J evidently viewed the sterility aspects with more concern. It had in mind its own established reputation in the health products field in respect to products for which it claimed sterility. It was concerned about current strict notions of misleading claims. And it would risk exposure to claims for civil liability, particularly in light of recent developments in the

law, as in *Anderson v. Somberg*, 67 N.J. 291, 338 A.2d 1 (1975), cert. den.; and see affirmance after the second trial, 158 N.J.Super. 384, 386 A.2d 413 (App.Div.1978).

These concerns in no way degrade the obvious utility of the sheath device, which at least assures presentation of a "clean" surface, if not a "sterile" one.

Also, it is well known that if an essentially clean line is desired from breaking or tearing, it can be achieved by providing a mechanically or structurally weak area where the line is desired. Newspaper can be folded and creased with a fingernail to weaken the fibers. It can then be torn reasonably straight even against the grain. A couple of saw cuts across a piece of wood will permit a fairly straight breaking across the grain. A slight crushing of a glass surface with a hardened steel wheel permits a fairly clean break along that line. Perforating a sheet of crackers or stamps, or molding chocolate into squares divided by thin sections, permits easy separation.

In all these common examples, the line of the tear or break is not straight and precise; it is irregular. The use of weak lines reduces the degree of irregularity but does not eliminate it. The line meanders.

These well known facts are confirmed by close inspection of the sheaths in this case. When the upper die is brought down into contact and the RF voltage is applied, it melts the plastic. The die is then pressed down further, to thin the tear line itself. But the intervening paper, thin though it be, blurs the profile of the die so that the tear line is tapered, rather than sharp. And, when the plastic is torn to form the sheath, the tear line meanders from side to side. Given the size of a microorganism, a slight meandering here and there into the seal itself is probably the cause of the difficulty.

What was offered in evidence, and what has been found on these issues, was not directed to making any determination about the substance of those issues. Rather, it was directed to the question whether non-use of the mark * STERITEMP, under all the circumstances of the case, amounted to sufficient proof to decide that there was an intent to abandon the mark.

* PONCY has the burden of persuasion on that issue. It has the benefit of the statute declaring that non-use for two years is *prima facie* evidence of abandonment. Congress did not say that this amounts to a presumption; it is something less, but will be treated here as though there were a presumption.

■ So far as the federal statute is involved, the matter is controlled by Fed.Ev. Rule 301, which makes it explicit that a presumption does not shift the burden of proof/persuasion. The legislative history, and particularly the notes in Conference Report No. 93--1597, U.S.Code Cong. & Admin.News 1974, p. 7051, establishes that the federal treatment is essentially the same as New Jersey's, N.J.Ev. Rules 13 and 14. Absent evidence to the contrary, proof of the underlying fact (here, non-use for two years) is enough to survive a motion; but if contrary proofs be offered, then the trier of fact resolves the question as it does any other issue of fact, using the underlying facts and any reasonable inferences on one side, and the contrary evidence on the other.

■ Treating two-year non-use as a statutory presumption, the court considers the inferences from the underlying fact to be weak. Since intention to abandon is the test, with non-use merely a mode of trying to prove intent, and since circumstances vary widely from case to case, an assertion of continued intent to use, coupled with evidence showing a reasonable explanation for non-use, is sufficient to support the conclusion that abandonment has not been established by a preponderance, and the claim of abandonment must fail.[5]

---

5. Some widely-known examples readily come to mind. Ford Motor Company this year is reviving the use of the name "Zephyr" after non-use for far more than two years. It is doubted that any competitor would claim the right to use the name "Edsel". The same is doubtless true of the "La Salle" of General Motors, last used about 1939 or 1940. When Kodak marketed its new color transparency film, "Kodachrome" in about 1937, it discontinued use of the name "Kodacolor" for an earlier and different kind of color film, and did not resume use of that name for more than two years and until it was able to produce a color film for paper prints instead of transparencies.

Given this finding, * PONCY has no defense for its conduct in using the mark * STERITEMP, registered and owned by another. So far as the mark itself is concerned, it is not merely confusingly similar, it is identical. So far as notions of unfair competition are pertinent, both the prefix and the suffix are the same as those in other brands and marks owned and used by * J & J. Aside from its ownership of the registered mark, it is entitled to protection of its other brands and marks which embody the segments * STERI or * TEMP against dilution as well as protection of reasonable expectations for other products.

Since * PONCY's product rests on the same patents, the same design and the same basic manufacturing process, it is itself an essentially identical item with variations in minor aspects. Under these circumstances, the obligation to make the trade-dress and brand as different as possible is more emphatic. Yet, not only did * PONCY use the very name it had sold, and which was not reconveyed, but in its advertising letters to potential customers it highlighted the claim that it had performed the manufacturing of the same item for * J & J, thereby deliberately trading on the latter's good will, as well as implying an identity of manufactured source when in fact the sources had been separated.[6]

Corroborating what has been said, there was evidence and an exhibit received in camera and under seal, of a new product under development by * J & J. From that testimony, as well as from detailed inspection and use of the exhibit, the court is satisfied that the product is one to which the mark can be applied consistent with the standards discussed above.

There can be no serious question that, on exercise of the option, * J & J validly acquired the patents, the machinery, the know-how and the good-will of * PONCY. The good-will included customer lists, and except for one customer that evidently declined to do business for personal or emotional reasons, nothing in the record suggests that the customer list was not employed, or that it was not useful in enlarging the market. The substitution of the prefix * J for * STERI, in view of the reasons for reluctance already mentioned, cannot be accepted as proof of abandonment of the good-will. That economic value, in somewhat different form, was retained and enlarged, as shown by the fact that volume was increased, though not to the point where the buyer felt the minimum royalty was adequately earned.

On termination, all that * PONCY had returned to it were the patents, and these were subject to a non-exclusive license. It did not have returned the machinery or the good-will (it already "knew" the know-how). While entitled to resume manufacture and to compete, its action in using the very trademark it had sold, had been paid for, and which was not reconveyed, is clearly unconscionable and inequitable.

The question is answered the same way when approached from a different direction. Suppose the product had been initially invented, produced and marketed by * J & J with the trademark * STERITEMP. Suppose, after that, that questions had been raised about the propriety of impliedly claiming sterility by the use of that trademark, and that the product was thereafter marketed under another name. Suppose that * PONCY thereafter negotiated and acquired a non-exclusive license to make and sell the product.

Can there be any question that * PONCY could not, under those circumstances, adopt and use the very trademark belonging to its licensor and rest its right to do so on the theory of abandonment? The mere suggestion of the question is enough to shock the conscience. It is too much like letting the camel's nose under the tent.

Finally, * PONCY has challenged the credibility of the witnesses against it, most recently (after reopening the trial) on the

---

6. See, e. g., *Pennwalt v. Becton, Dickinson*, 434 F.Supp. 758 (D.N.J., 1977).

ground that documentary proofs show that the witness did in fact make some editing suggestions to Bertha Litsky in connection with a technical paper she published on the basis, in part, of the tests she performed. He had previously testified that he had not edited her paper. Assuming as true that the documents prove his answer wrong, this shows no more than an innocent misrecollection and does not rise to the level required for discrediting the witness on the major aspects of his testimony.

From the facts found above, the court concludes that * J & J did not abandon the trademark * STERISEAL and that it remains the sole owner of it; that it did not acquire a naked trademark but also the good-will associated with it; that * PONCY's use of the trademark is in violation of the Lanham Act, and also constitutes unfair competition.

A declaratory judgment establishing the respective rights, duties and legal relations of the parties, as well as a permanent injunction against use of the trademark, will be entered.

In view of the fact that the questions decided are not close ones, the defense having fallen far short of meeting defendants' burden, there is no need to deal with the estoppel issue.

Submit draft of judgment accordingly.