**Stephen M. SILVERMAN, Plaintiff,**

v.

**CBS INC., Defendant.**

**No. 84 Civ 1894 (GLG).**

United States District Court,
S.D. New York.

Aug. 3, 1987.

Law Offices of Barry I. Fredericks, New York City (Barry I. Fredericks, Jonathan D. Davis, of counsel), for plaintiff.

Moses & Singer, New York City (David Rabinowitz, Stanley Rothenberg, of counsel), for defendant.

OPINION

GOETTEL, District Judge:

In the early days of radio, THE AMOS 'N' ANDY SHOW, created by Freeman F.

Gosden and Charles J. Correll, was among the most popular shows on the air. Throughout the 1930's and 1940's, people across the country gathered around their radios to hear the domestic squabbles of "Kingfish" Stevens and his wife Sapphire, the misadventures of Andy Brown, and the goings-on at the Mystic Knights of the Sea Lodge. To many, AMOS 'N' ANDY evokes a profound nostalgia of a simpler time.

In 1948, CBS purchased all rights in connection with THE AMOS 'N' ANDY SHOW, and retained Gosden and Correll to continue creating new episodes, which were aired on radio until 1955. In 1951, CBS began broadcasting THE AMOS 'N' ANDY SHOW on television. The AMOS 'N' ANDY characters, as conceived by Gosden and Correll, were black, and were portrayed on television by black actors. On radio, the roles were played by Gosden and Correll, who were white, although publicity photos showed them in blackface.

In November 1964, CBS withdrew THE AMOS 'N' ANDY SHOW from television syndication. It did this in response to pressure from civil rights groups, especially the N.A.A.C.P., that claimed the show presented a demeaning portrayal of blacks.

### Background

The background of this controversy is set forth in our prior decision, 632 F.Supp. 1344 (S.D.N.Y.1986) ("*Silverman I*"), and will not be repeated in its entirety. However, a brief recap may be helpful.

In 1981, plaintiff Steven M. Silverman, an entertainment reporter for the New York Post, wrote to CBS about his idea to create a Broadway musical based on AMOS 'N' ANDY. CBS rejected this idea and refused to grant Mr. Silverman a license to use AMOS 'N' ANDY in his proposed production.

In 1984, Mr. Silverman filed this suit seeking a declaration regarding his right to use the AMOS 'N' ANDY characters and other elements of the old radio and television shows. CBS quickly moved to dismiss the suit for lack of a justiciable controversy. The plaintiff responded that he had made substantial preparations to produce his play and was being hampered from obtaining necessary financing because of the likelihood that CBS would sue for infringement after the show was produced. We found the plaintiff's arguments sufficient to defeat the motion to dismiss.

Thereafter, CBS asserted five counterclaims against Silverman and moved for summary judgment. In deciding that motion, we found as follows: The scripts of the 1928–1948 radio programs are in the public domain, but CBS holds valid copyrights in all of the AMOS 'N' ANDY radio performances, and in the radio scripts after 1948; CBS also holds valid copyrights in all of the AMOS 'N' ANDY television programs. *Silverman I, supra,* 632 F.Supp. at 1350–55. Moreover, the name AMOS 'N' ANDY, as well as the characters' names and appearances, and other distinctive features of the AMOS 'N' ANDY radio and television shows, are protectable trademarks. *Id.* at 1356–57. We reserved for trial the question of whether, due to nonuse, CBS has abandoned its rights in any marks associated with AMOS 'N' ANDY. That trial having been held, the following are our findings of fact and conclusions of law on the issue of abandonment.

### Additional Facts

CBS has not exploited the AMOS 'N' ANDY radio and television series and the trademarks associated therewith (collectively, the "Property") for over twenty years. CBS has no present plan to resume use of the Property at a specific time in the future, but wishes to keep this option open. CBS strongly opposes use of the Property by anyone else.

A significant factor in CBS's desire to keep AMOS 'N' ANDY off the market is its concern with the sensitivity of the subject matter, and its expectation of again being put in disfavor with civil rights groups.

CBS has received numerous requests for licenses to use the Property, and has, for the most part, refused to grant them. The only uses of the Property that CBS has sanctioned have been educational or historical. For example, CBS used excerpts from the AMOS 'N' ANDY television series in a CBS News Special, OF BLACK AMERICA,

broadcast in 1968. In 1972, CBS licensed the use of the same excerpts for inclusion in a motion picture entitled MALCOLM X. In 1982, CBS granted a license to the Writer's Workshop to incorporate elements of the Property in a limited run play entitled WHAT EVER HAPPENED TA AMOS 'N' ANDY? In 1983, CBS granted a license to Michael Avery to use excerpts from several television episodes of AMOS 'N' ANDY as part of a one-hour film documentary entitled AMOS 'N' ANDY: ANATOMY OF A CONTROVERSY.

CBS has periodically reconsidered other uses and licensing of the Property, but, to date, has rejected such proposals.

During the years since AMOS 'N' ANDY was withdrawn from broadcast, CBS has not aggressively policed its copyrights or trademark rights. However, when infringements have been brought to its attention, CBS has immediately demanded that infringers cease and desist unauthorized use of the Property.

In 1961, CBS obtained copyright registration for seven AMOS 'N' ANDY television episodes; these were renewed in 1981. In 1978 and 1980, CBS registered approximately 70 more episodes; these copyrights were also renewed in 1981. Between September 1984, and February 1985, CBS sought and obtained copyright registration for approximately 80 AMOS 'N' ANDY radio shows. CBS never sought trademark registration for the marks associated with AMOS 'N' ANDY.

After this litigation began, the plaintiff revised his script and deleted AMOS 'N' ANDY from the title of his proposed Broadway show; he also deleted all dialogue challenged by CBS as infringing.[1] The plaintiff's proposed production is still built around the AMOS 'N' ANDY characters.[2]

*Discussion*

As defined in the Lanham Act, 15 U.S.C. §§ 1051–1127 (1982), a trademark is "any word, name, symbol, or device ... adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." *Id.* § 1127. "Titles, character names and other distinctive features of radio or television programs" are also protectable marks.[3] *Id.* This may include the physical appearance and costumes of entertainment characters. *See Silverman I, supra,* 632 F.Supp. at 1355–56.

■■■ Both registered and unregistered marks are protected under the Lanham Act. *See Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78 (2d Cir.1981). An unregistered mark is protectable for as long as it continues to be used. Nonuse may result in a finding of abandonment, and a loss of the owner's exclusive rights in the mark. *See* 1 J. McCarthy, *Trademarks and Unfair Competition* § 17:3 (2d ed. 1984).

The Lanham Act provides that "[a] mark shall be deemed to be 'abandoned'—(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment." 15 U.S.C. § 1127 (1982). Two elements are required for abandonment: (1) nonuse, *and* (2) intent not to resume use. *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1043 (2d Cir.198). By allowing nonuse for two years to constitute prima facie abandonment, the statute effectively grants a presumption of "intent not to resume use" once the statutory period of nonuse is shown to have elapsed. This presumption is rebuttable, *id.* at 1044, and may be over-

---

**1.** Unfortunately, this did not save the plaintiff from a finding that the prior script had infringed CBS's copyrights. *See Silverman I, supra,* 632 F.Supp. at 1352.

**2.** The primary property right at issue here appears to be the right to use the AMOS 'N' ANDY characters, although, arguably, additional AMOS 'N' ANDY marks will be implicated in the plaintiff's proposed show.

**3.** The Lanham Act designates these as "service marks." 15 U.S.C. § 1127 (1982). However, since the Act accords the same protection to both service marks and trademarks, we will use the more familiar term "trademarks," or simply "marks."

come by evidence demonstrating that circumstances do not justify an inference of intent not to resume use. *Sterling Brewers, Inc. v. Schenley Industries, Inc.,* 441 F.2d 675, 679 (C.C.P.A.1971). It must be remembered, however, that a presumption merely imposes on the party against whom it is directed the burden of going forward with evidence to meet or rebut the presumption; it does not shift the ultimate burden of proof in the sense of the risk of nonpersuasion, which remains on the party on whom it was originally cast. *See* Fed.R. Evid. 301.

The facts of this case are reasonably clear, albeit unique. It is the application of existing law to these facts that is troublesome. One of the most unusual aspects of this case is that we are dealing with marks associated with radio and television shows, which are also protected by copyrights. Other abandonment cases reviewed by this Court involve trademarks used in connection with some tangible, consumer product, *e.g.,* beer, bottled water, buttons, and magazines, not similarly subject to copyright protection. No court, to our knowledge, has considered abandonment of entertainment marks that are simultaneously protected by copyright.[4] We have already ruled that CBS holds valid copyrights protecting the AMOS 'N' ANDY characters. *See Silverman I, supra,* 632 F.Supp. at 1355. Thus, regardless of whether or not the AMOS 'N' ANDY marks have been abandoned, unauthorized use of the characters could leave the door open for a copyright infringement suit. The plaintiff, however, has pursued this litigation through trial on the issue of abandonment, and seeks a declaration regarding his right to use any marks associated with AMOS 'N' ANDY, not just the characters. Having come this far, he is entitled to a complete ruling.

■ CBS has made only limited use of the AMOS 'N' ANDY marks over the last two decades. Although this does not automatically result in loss of all trademark rights, such limited use cannot avoid prima facie abandonment pursuant to 15 U.S.C. § 1127. *See Exxon Corp. v. Humble Exploration Co.,* 695 F.2d 96, 102 (5th Cir. 1983). To retain its rights, CBS must meet the presumption thus created with evidence demonstrating that circumstances do not justify an inference of intent not to resume use. *Sterling Brewers, Inc. v. Schenley Industries, Inc., supra,* 441 F.2d at 679. CBS has come forward with evidence showing licensing of AMOS 'N' ANDY shows for educational and historical purposes, registering and renewing copyrights in over 100 television and radio shows, challenging infringing uses whenever these became known to CBS, and periodically reconsidering revival of the television series. This evidence, coupled with CBS's strenuous assertion of its intent not to abandon these marks, suffices to meet the presumption and shift the burden of persuasion back to the plaintiff to prove abandonment.

The plaintiff argues that CBS is really warehousing the AMOS 'N' ANDY marks, keeping them off the market and yet asserting the right to prevent others from using them. He contends that only "commercial use," or intent to resume commercial use, will allow CBS to retain its rights in the marks. *See Exxon Corp. v. Humble Exploration Co., supra,* 695 F.2d at 102, *on remand,* 592 F.Supp. 1226, 1229 (N.D. Tex.1984). In *Exxon* the Fifth Circuit considered whether a trademark owner could retain rights in a mark that was being used only in connection with limited product distribution, as part of a trademark maintenance program. The plaintiffs claimed they did not intend to abandon their rights in the mark, but the Fifth Circuit ruled that the plaintiffs' use of the mark was insufficient to avoid a finding of prima facie abandonment. 695 F.2d at 102. The court stressed that the Lanham Act "does not allow the preservation of a mark solely to prevent its use by others," and that intent not to abandon is different from intent to

---

**4.** If copyrights in an entertainment work have expired, a question arises of whether marks associated with that work can continue indefinitely, provided they continue to be used and to retain their significance as a designation of origin and goodwill. However, this is not a question we must now decide.

resume use. *Id.* at 101–02. To maintain a mark in the absence of use, the Fifth Circuit required that the owner have plans to resume commercial use of the mark. *Id.* at 102. On remand, the district court applied the "intent to resume commercial use" standard, but found adequate evidence of such an intent, and ruled that the plaintiffs had not abandoned their rights in the mark. 592 F.Supp. at 1230–31.

In response, CBS notes that "commercial use" is not explicitly required to obtain or sustain a trademark, although use "in commerce" is required for registration of a trademark.[5] *See* 15 U.S.C. § 1051. The *Exxon* case clearly requires intent to resume commercial use of a mark to combat a claim of abandonment. However, *Exxon* is a Fifth Circuit decision, and we must first be guided by Second Circuit precedents on the question of abandonment.

 No Second Circuit case has addressed whether prima facie abandonment may only be overcome by proving intent to resume commercial use. We note, however, that the Second Circuit has gone to great lengths to avoid finding a mark abandoned. Hence, we seriously doubt whether the Fifth Circuit's more stringent "commercial use" requirement would be adopted by this Circuit.

To find a mark abandoned, the Second Circuit requires a showing not only of acts indicating a practical abandonment, but also of " 'actual intent to abandon. Acts which unexplained would be sufficient to establish an abandonment may be answered by showing that there never was an intention to give up and relinquish the right claimed.' " *Wallace & Co. v. Repetti, Inc.* 266 F. 307 (2d Cir.), *cert. denied,* 254 U.S. 639, 41 S.Ct. 13, 65 L.Ed. 451 (1920) (quoting *Saxlehner v. Eisner & Mendelson Co.,* 179 U.S. 19, 31, 21 S.Ct. 7, 11–12, 45 L.Ed. 60 (1900)); *see Saratoga Vichy Spring Co. v. Lehman, supra,* 625 F.2d at 1044. This approach is consistent with the statutory language regarding abandonment, which is couched in terms of "intent *not* to resume" rather than "intent *to* resume" use. It is also consistent with the well-established principle that abandonment, being in the nature of a forfeiture, must be strictly proved. *See Citibank, N.A. v. Citibanc Group, Inc.,* 724 F.2d 1540, 1545 (11th Cir. 1984); *Saratoga Vichy Spring Co. v. Lehman, supra,* 625 F.2d at 1044; *American Foods, Inc. v. Golden Flake, Inc.,* 312 F.2d 619, 624–25 (5th Cir.1963); *Neva-Wet Corp. v. Never Wet Processing Corp.,* 277 N.Y. 163, 13 N.E.2d 755 (1938).

Two cases are particularly instructive in understanding the Second Circuit's reluctance to declare trademarks abandoned. In *Defiance Button Machine Co. v. C & C Metal Products Corp.,* 759 F.2d 1053 (2d Cir.), *cert. denied,* 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985), the plaintiff, a well established manufacturer and seller of metal buttons and the equipment with which to make such buttons, ceased operations and sold all of its tangible assets, including the means to manufacture the buttons, to defendant C & C Metal Products. The plaintiff hoped, thereafter, to sell its DEFIANCE trademark, and the goodwill purportedly attached thereto, but never received a financially acceptable offer. The plaintiff eventually became a subsidiary of a competing button manufacturer, and sought to resume use of its DEFIANCE mark. The defendants, by then, were using the name DEFIANCE to identify buttons they manufactured using the dies and machinery acquired from the plaintiff. The plaintiff brought suit to enjoin defendants from using this mark. When the case reached the Second Circuit, the plaintiff had still not resumed production of buttons. The Circuit court noted that the owner's conduct in attempting to sell the mark and the goodwill associated therewith, and later deciding to resume business, was inconsistent with an intent to abandon its trademark. *Id.* at 1061. Accordingly, the court refused to find the mark abandoned, even though any goodwill associated with the mark had in fact been

---

**5.** CBS also notes that the amount of use necessary to avoid a finding of abandonment is less than that needed to establish a trademark in the first place. *See Waldes v. International Manufacturers Agency, Inc.,* 237 F. 502 (S.D.N.Y.1916) (L. Hand, J.).

lost when C & C Metal acquired a copy of the plaintiff's customer list along with the plaintiff's machinery.

In *Saratoga Vichy Spring Co. v. Lehman, supra,* the State of New York was forced to discontinue use of the mark SARATOGA GEYSER when the state legislature eliminated appropriations for the operation of a mineral water bottling plant in the Saratoga Springs area. The state thereafter sought to lease the bottling operation. However, litigation with a former distributor prevented this, and the state had to close the plant. Two years after the litigation ended, the state reached a license agreement with a company other than the plaintiff to use the SARATOGA GEYSER mark. The plaintiff brought suit claiming infringement of its SARATOGA VICHY mark. On the issue of whether the SARATOGA GEYSER mark had been abandoned, the Second Circuit stated that "New York's nonuse was caused by the decision of the legislature to have the State withdraw from the mineral water business, and the State thereafter sought continuously to sell the business with its good will and trademark. These facts are completely inconsistent with an intent to abandon the mark." 625 F.2d at 1044.

 The circumstances of the instant case are different from either *Definance Button* or *Saratoga Vichy,* in that CBS is not attempting to sell its AMOS 'N' ANDY marks. However, CBS has made it abundantly clear that it does not intend to abandon these marks. It has continued to license limited uses of the Property, to periodically reconsider resuming use, and to challenge infringing uses that have been brought to its attention.[6] Also, during the past ten years, CBS has registered for, or renewed, copyrights in over 100 of the AMOS 'N' ANDY radio and television shows. These actions are entirely inconsistent with an intent to abandon or relinquish rights in the AMOS 'N' ANDY marks.

An additional factor must be considered in this case. CBS argues that nonuse due to circumstances beyond its control is excusable, and should not result in loss of trademark rights. *See* 1 J. McCarthy, *Trademark and Unfair Competition* § 17:4 (2d ed. 1984). CBS withdrew AMOS 'N' ANDY from syndication in 1964, because of pressure from civil rights groups. During the intervening years, CBS has considered whether the time was right to bring back this series. But, despite the popularity of reruns of other old series such as "The Honeymooners," and recent situation comedies such as "The Jeffersons," and "The Bill Cosby Show," which feature black families, CBS obviously believes that civil rights groups would still find the portrayal of blacks in AMOS 'N' ANDY to be offensive. Although the plaintiff, and even this Court, may disagree with CBS's assessment of the type of reception AMOS 'N' ANDY would receive today, we cannot substitute our subjective perceptions for an objective evaluation of the reasonableness of CBS's actions. *See Poncy v. Johnson & Johnson,* 460 F.Supp. 795, 802 (D.N.J. 1978).

Recalling the pervasive racial tension that swept this country in the 1960's, and which remains a continuing problem in

---

**6.** The plaintiff argues that CBS has not forcefully policed its AMOS 'N' ANDY marks. We cannot help but note the inconsistency between this and the plaintiff's prior argument, that declaratory relief should be granted because of the likelihood CBS will sue for infringement if Mr. Silverman produced his show without its consent. This aside, the plaintiff's argument is still unavailing. Failure to police a mark can be evidence of, but does not automatically constitute, abandonment. *See* 1 J. McCarthy *Trademarks and Unfair Competition* § 17:5 (2d ed. 1984). Since CBS has reaped scant financial rewards from the Property since it suspended syndication of the television series in 1964, we

find its policing activities have been reasonable, and adequate to belie any intent to abandon its marks.

Failure to police a mark can also cause it to lose its significance as an indication of origin, and, thus, be deemed abandoned. 15 U.S.C. § 1127(b) (1982). Here, however, the plaintiff himself has stressed the strong public recognition of AMOS 'N' ANDY as a factor in his desire to create a Broadway musical based on the old radio and television programs. Numerous other requests for licenses to use the Property further attest to the continued public recognition of AMOS 'N' ANDY.

many areas of the country and in many aspects of daily life, we cannot say that CBS's reluctance to revive AMOS 'N' ANDY is unreasonable, given the fact that civil rights groups seem to find the depiction of blacks in AMOS 'N' ANDY to be demeaning. It would be offensive to basic precepts of fairness and justice to penalize CBS, by stripping it of its trademark rights, merely because it succumbed to societal pressures and pursued a course of conduct that it reasonably believes to be in the best interests of the community.

*Conclusion*

In light of the evidence presented in this case, including (1) CBS's assertion of its intent to resume use of AMOS 'N' ANDY, and the marks associated therewith, if and when the social climate becomes more favorable, (2) its reasonable explanation for nonuse, and (3) its continuing efforts to police and protect its rights in this Property, we find that CBS has not abandoned its rights in the marks associated with AMOS 'N' ANDY. This ruling, together with *Silverman I*, constitutes our entire decision regarding the plaintiff's right to freely use the AMOS 'N' ANDY Property. In a nutshell, he may not. CBS may submit its request for damages on the copyright infringement found pursuant to our decision in *Silverman I*.[7] We will then rule on that request, and on the defendant's motion for attorneys' fees and other sanctions.[8]

SO ORDERED.

---

**7.** The infringement found in *Silverman I* was for unauthorized use of dialogue from several copyrighted radio programs. 632 F.Supp. at 1352. We declined to rule on CBS's other copyright infringement claims, which we found to be premature. *Id.* at 1355. The alleged infringement of CBS's copyrights in the television series is based primarily upon copying of the characters as they appeared on television, and other aspects of the visual presentation of AMOS 'N' ANDY. It is impossible to determine the element of substantial similarity necessary to rule on a claim of copyright infringement, without seeing a fully staged production of the plaintiff's proposed Broadway show. *Id.* A ruling on trademark infringement would be similarly pre-

mature, since it too involves consideration of the similarity between the AMOS 'N' ANDY characters as they originally appeared and developed as marks and as they may be cast and costumed in a production of the plaintiff's proposed play. *See id.* at 1357 n. 17.

**8.** The defendant's motion for sanctions is directed against plaintiff and three counsel that have represented plaintiff in this action. One predecessor counsel not only opposes imposition of sanctions, but also cross moves for a protective order pursuant to Fed.R.Civ.P. 26(c), claiming attorney-client privilege and attorney's work product privilege.