**EXXON CORPORATION, Humble Oil & Refining Corporation, Humble Gas Transmission Co. and Humble, Inc., Plaintiffs-Appellees,**

v.

**HUMBLE EXPLORATION COMPANY, INC., Defendant-Appellant.**

No. 81–1386.

United States Court of Appeals, Fifth Circuit.

Jan. 10, 1983.

Rehearing and Rehearing En Banc Denied March 3, 1983.

David Ford Hunt, Richards, Harris & Medlock, Roger C. Clapp, William R. Gustavson, William D. Harris, Jr., Dallas, Tex., for defendant-appellant.

Strasburger & Price, Patrick F. McGowan, Dallas, Tex., David Goldberg, New York City, for plaintiffs-appellees.

Before THORNBERRY, JOHNSON and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge.

Humble Exploration Company, Inc. appeals from an order of the district court, 524 F.Supp. 450, enjoining its use of "Humble" as a trade name. The main issue on appeal is whether the district court erred in finding that Exxon Company, U.S.A. had not abandoned the use of the trademark HUMBLE.[1] Because we find that the lim-

---

1. Appellants also argue on appeal that the district court erred in finding likelihood of confu-   sion with regard to the general public rather

ited arranged sales of HUMBLE products as part of Exxon's trademark maintenance program are insufficient uses to avoid prima facie abandonment under 15 U.S.C. § 1127, we reverse and remand to the district court for a determination of Exxon's intent to resume use of the trademark.

## I. FACTS

Humble Oil and Refining Company was founded as a Texas corporation in 1917. Its activities included oil exploration, refining and marketing. In 1959, that company and the other regional affiliated oil companies owned by Standard Oil Company of New Jersey merged to form a larger Humble Oil & Refining Company, a Delaware corporation.

In the early 1960's, the newly expanded Humble Oil & Refining Company introduced a new branding system for its products and service stations. Throughout the country, large HUMBLE signs were erected on the company's service stations, totalling over 20,000 by 1972. At each station, a second sign in an oval located at the roadside carried a regional house mark: ENCO in Texas and other western states, ESSO in the eastern states and HUMBLE in the state of Ohio. From the early 1960's through 1972, the Humble Oil & Refining Company name appeared on all of the Company's packaged products, sometimes accompanied by the trademark ESSO, ENCO or HUMBLE, depending on the intended area of sale.

Because its management concluded that the use of three trade names, HUMBLE, ESSO and ENCO, was confusing to customers, in late 1972 Humble Oil & Refining Company adopted the name EXXON as its sole primary brand name and on January 1, 1973, Humble Oil & Refining Company became Exxon Company, U.S.A. Exxon spent in excess of twelve million dollars in advertising its name change in television and print media. EXXON signs replaced the three regional signs and all packaged products were relabeled with EXXON labels before distribution. Except for inventory at the service station level, the changeover was complete by mid-1973.

On April 12, 1972, the Board of Directors of Humble Oil & Refining Company passed a resolution calling for continued use of HUMBLE after the changeover to EXXON "in ways other than as a primary brand name." Company publications expressed the intention to protect the name HUMBLE. To do so, Exxon instituted a trademark maintenance program for the mark. Initially there were two facets to the program. First, limited sales of packaged Exxon products with both HUMBLE and EXXON names on the label were made to targeted customers. According to the record, the sales totalled $9.28 in 1973, $.0 in 1974, $140.12 in 1975 and $42.05 in 1976. Second, three corporations—Humble, Inc., Humble Gas Transmission Co. and Humble Oil & Refining Corporation—were formed as "name protection companies." The companies sold bulk Exxon gasoline and diesel fuel to selected customers with the name HUMBLE on the invoice for the sale. Over a seven year period from 1973 through 1979, the sales totalled $395,814. Beginning in 1977, Exxon began shipping 55 gallon drums of its petroleum products from the Baytown, Texas refinery. The drums bore both EXXON and HUMBLE marks.

The appellant corporation was incorporated in Texas under the name Humble Exploration Company in May, 1974. Pat Holloway, the chief executive officer, testified that he selected the name "Humble" because it was abandoned when Exxon

than with regard to the relevant purchasing public. Prior to its amendment in 1962, 15 U.S.C. § 1114 authorized infringement actions for uses of a mark in connection with goods or services that were "likely to cause confusion, or to cause mistake or to deceive purchasers as to the source of origin of such goods or services." Deletion of the underlined language by the 1962 amendment suggests that confusion of the general public is a proper test. Regardless, the proper group to be considered is large enough to include the suppliers to Humble Exploration Company and the landowners who leased to Humble, who were actually confused in this case. The district court's finding of likelihood of confusion between Exxon's HUMBLE and Humble Exploration Company is not error.

changed its name. At first, appellant's activities were limited to passive investments in oil ventures, but it later became actively involved in oil exploration. To date it has drilled 125 wells in the Austin Chalk trend, in Texas, selling at the wellhead its crude oil and natural gas. After Exxon became aware of appellant, it demanded on January 11, 1977 that appellant cease its use of the name "Humble." Appellant refused. On June 2, 1977, Exxon filed this suit, asking for injunctive relief.

## II. ABANDONMENT OF HUMBLE

■ The district court framed the abandonment issue thus: "Is the limited use of a famous trademark solely for protective purposes a use sufficient to preclude abandonment under the common law and the Lanham Act?" It answered the question in the affirmative. Plaintiff-Appellee withdrew its Texas and common law claims in the district court, so the resolution of the abandonment issue must focus on the federal standards for abandonment set forth in the Lanham Act.

Under the Act,

A mark shall be deemed to be abandoned—

(a) When its use has been discontinued with intent not to resume use. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

15 U.S.C. § 1127 (1982). The burden of proof is on the party claiming abandonment, but when a prima facie case of trademark abandonment exists because of nonuse of the mark for over two consecutive years, the owner of the mark has the burden to demonstrate that circumstances do not justify the inference of intent not to resume use. See *Sterling Brewers, Inc. v. Schenley Industries, Inc.*, 441 F.2d 675, 679 (Cust. & Pat.App.1971).

■ Appellant argues that Exxon has not used the HUMBLE mark since its changeover program. Since that time,

Exxon has 1) sold existing inventory of packaged products bearing the name "Humble Oil and Refining Company"; 2) made periodic sales of nominal amounts of Exxon gasoline, motor oil and grease in pails bearing the names HUMBLE and EXXON; 3) sold Exxon bulk gasoline and diesel fuel to selected customers, who received HUMBLE invoices, through three corporations organized for that purpose; and 4) sold 55-gallon drum products from the Baytown, Texas refinery, all bearing a stencil with the names HUMBLE and EXXON.

The existing inventory was depleted by mid-1974; the sale of 55 gallon drums began in 1977. Whether or not these sales are "uses" for the purposes of 15 U.S.C. § 1127, the period between those sales was longer than two years, and under the Lanham Act, "nonuse for two consecutive years is prima facie abandonment." 15 U.S.C. § 1127. During that period between sales of inventory and sales of 55-gallon drum products,[2] Exxon can point to only two types of sales as possible uses. As earlier described, Exxon made limited sales of packaged products with both EXXON and HUMBLE on the labels to targeted customers in these amounts: $9.28 in 1973, $.0 in 1974, $140.12 in 1975 and $42.05 in 1976. Second, products in bulk form and not bearing a trade name or mark were sold to selected customers who received the explanation that they were receiving Exxon products. The only use of HUMBLE in connection with these sales was on the invoices sent to the customers. The issue, thus, is whether these two categories of arranged sales through the trademark protection program during that period constitute "use" sufficient to avoid prima facie abandonment.

Appellant relies primarily on *La Societe Anonyme des Parfums LeGalion v. Jean Patou, Inc.*, 495 F.2d 1265 (2d Cir.1974), and *Procter and Gamble v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185 (S.D.N.Y.1979), *aff'd without opinion*, 636 F.2d 1203 (2d Cir.1980),

---

**2.** The HUMBLE name was not affixed to the 55-gallon drum products until September, 1977. This suit was filed on June 2, 1977. The inquiry must focus upon whether Exxon abandoned the mark before that time.

to support its argument that arranged sales are nonuse. In *Jean Patou,* the plaintiff LeGalion, a French perfume manufacturer, had sold its perfume under the trademark SNOB in a number of foreign countries but was unable to sell its product in the United States because of Patou's registration for the mark in this country. Claiming that Patou had not established rights in the mark, LeGalion filed suit. The facts revealed that Patou had made 89 sales of perfume over a 20-year period and engaged in no advertising. The court found that Patou's real purpose in making the 89 sales was to keep a competitor at bay and that this "purely defensive" token use was insufficient to obtain enforceable rights in the mark. *Id.* at 1273–74. The court observed: "The token sales program engaged in here is by its very nature inconsistent with a present plan of commercial exploitation." *Id.* at 1273. It continued: "A trademark maintenance program obviously cannot in itself justify a minimal sales effort, or the requirement of good faith commercial use would be read out of the trademark law altogether." *Id.* at 1273 n. 10.

In *Procter and Gamble,* the plaintiff maintained a "Minor Brands Program" for the purpose of protecting its ownership rights in brand names not being actively used in commerce on its products. Employees not normally involved in Procter and Gamble's (P & G's) merchandising operation took an active P & G product, labeled it with a minor brand, and shipped it to customers. For example, P & G's Prell shampoo was bottled under thirteen different minor brand labels. Fifty units of each were shipped annually to at least ten states. The court held that the plaintiff had no enforceable rights in the mark SURE for tampons on the basis of its inclusion in this minor brands program.

The district court below distinguished these cases because they treat the acquisi-

tion or adoption of a trademark that has not developed goodwill. According to the court, Exxon's use of the HUMBLE mark "in commerce for protective purposes is a good faith use" because of the residual goodwill built up in the mark. Despite the trial court's distinction, section 1127 of the Lanham Act, without mentioning goodwill, requires continued use of a mark or intent to resume use to avoid a finding of abandonment. The first requirement is not present on this record. The limited sales of packaged products to targeted customers and the arranged sales of bulk products through the three shell corporations were not sufficient uses to avoid prima facie proof of abandonment under the statute. The HUMBLE trademark was not used to identify the source of the goods. The packaged products were Exxon products with HUMBLE used as a secondary name. Of course, "the fact that a product bears more than one mark does not mean that each cannot be a valid trademark." *Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.,* 477 F.2d 150, 154 (6th Cir.1973). For example, in *Old Dutch* the defendant had used concurrent marks, OLD DUTCH and DAN DEE, on all his products for over thirty years. Each mark must, however, be a bona fide mark. *See Blue Bell, Inc. v. Farah Manufacturing Company, Inc.,* 508 F.2d 1260, 1267 (5th Cir.1975).

In this case, the mark HUMBLE was used only on isolated products or selected invoices sent to selected customers. No sales were made that depended upon the HUMBLE mark for identification of source. To the contrary, purchasers were informed that the selected shipments would bear the HUMBLE name or be accompanied by an HUMBLE invoice but were the desired Exxon products. That is, the HUMBLE mark did not with these sales play the role of a mark.[3] That casting, however, is cen-

**3.** Exxon's counsel conceded at oral argument that with all sales relied upon for use, the mark did not play its role as an identifier, that "targeted" customers were told of the plan and the source of the goods. We do not suggest that sales in which the mark is relied upon to identi-

fy source are inadequate solely because the seller makes those sales for the subjective purpose of maintaining the mark. The question is whether the mark's role is real or fictional. When it is necessary to explain the role of the

tral to the plot that the Lanham Act rests on the idea of registration of marks otherwise born of use rather than the creation of marks by the act of registration. That precept finds expression in the Lanham Act requirement that to maintain a mark in the absence of use there must be an intent to resume use. That expression is plain. The Act does not allow the preservation of a mark solely to prevent its use by others. Yet the trial court's reasoning allows precisely that warehousing so long as there is residual good will associated with the mark. Exxon makes the same argument here. While that may be good policy, we cannot square it with the language of the statute. In sum, these arranged sales in which the mark was not allowed to play its basic role of identifying source were not "use" in the sense of section 1127 of the Lanham Act.

In finding that "there is no reason of competitive fairness" for finding an abandonment because the HUMBLE mark had amassed enormous residual goodwill, the district court relied on two decisions of the Trademark Trial and Appellate Board. In *American Motors Corp. v. Action-Age, Inc.,* 178 U.S.P.Q. 377 (T.T.A.B.1973), the Board held SCRAMBLER could not be registered as a trademark because of a likelihood of confusion with the famous mark RAMBLER, used by American Motors. The Board, emphasizing the continued goodwill of the mark, stated:

> While opposer has discontinued the use of "RAMBLER" as a trademark for vehicles produced by opposer over the past few years, the record falls far short of establishing any abandonment thereof. In fact, there is a considerable reservoir of goodwill in the mark "RAMBLER" in this country that inures to opposer as a consequence of the large number of "RAMBLER" vehicles still on the road; opposer's activities in supplying "RAMBLER" parts and accessories to owners of these vehicles; and the use by dealers of the term "RAMBLER" as a portion of their corporate or business names and their maintenance of "RAMBLER" signs on their premises.

mark and the source of goods to selected cus-

*Id.* at 378. The Board thus suggested that the maintenance of goodwill was connected to significant ongoing commercial activities using the trademark. In *Lyon Metal Products, Inc. v. Lyon Incorporated,* 134 U.S. P.Q. 31 (T.T.A.B.1962), a manufacturer that had extensively promoted and sold kitchen equipment for ten years under the trademark LYON discontinued the sale of the equipment at retail but continued to sell to builders under the same trademark. Six months after the retail sale of the equipment was discontinued, another manufacturer began marketing sinks under the name LYONCRAFT. The Board refused to register the mark and noted that the "discontinuance of one channel of distribution cannot constitute an abandonment, per se of the mark for such goods.... [T]here is nothing to preclude opposer as the prior user of the mark "LYON" in the field to resume, at some time in the future, the retail sale of its "LYON" kitchen equipment...." *Id.* at 35. In dictum the Board noted:

> Even assuming arguendo that the [mark holder] has abandoned use of the mark ... a question arises as to whether under such circumstances as here, where a party has, for ten years, extensively advertised and promoted a product under a mark with substantial commercial success another party ... can enter the field and sell closely related goods ... without creating confusion in the trade as to the source of the goods and damage to the first party. The substantial goodwill which accrued to the first party because of his extensive promotion and use of his mark does not cease immediately upon a decision to discontinue manufacture and sale of the goods associated with said goodwill. There is a residual goodwill in the mark ... until ... the purchasing public no longer is reasonably likely to associate the second party's product with the first party.

*Id.* at n. 5. Despite this dictum, the two cases relied upon by the district court are

tomers, the sale by use of a mark is fictional.

distinguishable from the facts before us. In *American Motors* the court focused on the continued extensive use of RAMBLER in parts and dealership names; in *Lyon Metal,* the opposer actually continued using the same trademark but in a different market.

■ This court recognizes that the goodwill associated with the mark HUMBLE has immense value to Exxon. That fact, coupled with the efforts under the trademark maintenance program, could suggest Exxon's intent to resume use of the mark,[4] but the trial court did not make that finding. The court found that the trademark protection program evidenced "an intent not to relinquish HUMBLE" and "an intent not to abandon HUMBLE," but it did not specifically address Exxon's intent to resume use as required by section 1127 the Lanham Act. The trial court relied on the language of *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037 (2d Cir.1980), in which the court observed: " 'Acts which unexplained would be sufficient to establish an abandonment may be answered by showing that there was never an intention to give up and relinquish the right claimed.' " *Id.* at 1044 (quoting *Saxlehner v. Eisner & Mendelson Co.,* 179 U.S. 19, 31, 21 S.Ct. 7, 12, 45 L.Ed. 60 (1900)). There is a difference between intent not to abandon or relinquish and intent to resume use in that an owner may not wish to abandon its mark but may have no intent to resume its use. In factual contexts where there is no issue of a hoarding of a mark, the language "an intent to abandon or relinquish" may be used to express the Lanham Act requirement of an "intent not to resume use." For that reason, it is important that cases using the language of "intent to abandon" be carefully laid into their factual molds. In *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134 (3d Cir.1981), the court concluded: "[The] twin requirement of nonuse and *intent to abandon* is embodied in [15 U.S.C. § 1127(a) ] of the statutory definition of abandonment" (emphasis supplied). This interchange of intent to abandon for intent to resume use was unimportant because there was no claim that the owner wanted to retain the mark only to prevent its use by others. It is not authority for the assertion that intent to resume use does not mean what it says but instead allows hoarding. In the context of a challenge strictly under the Lanham Act to an alleged warehousing program, as the facts of this case present, the application of the statutory language is critical.[5] That is, this court having found that the two types of uses under the trademark maintenance program were not sufficient uses to avoid prima facie proof of abandonment, the district court must specifically address Exxon's intent to resume use of the HUMBLE trademark.[6] An "intent to resume" requires the trademark owner to have plans to resume commercial use of the mark. Stopping at an "intent not to abandon" tolerates an owner's protecting a mark with neither commercial use nor plans to resume com-

4. In *Sterling Brewers, Inc. v. Schenley Industries, Inc.,* 441 F.2d 675 (Cust. & Pat.App.1971), the court decided that the goodwill of a trademark for beer had not dissipated through eight years of nonuse. Significantly, the court found that "the continuous activity . . . directed to maintenance of the brewery during the period of non-use, coupled with the refusal to consider periodic efforts of appellant to negotiate purchase of the rights to the mark separately, demonstrates an intent to maintain conditions conducive to resumption of production under the mark on relatively short notice." *Id.* at 680.

5. The court notes that the Lanham Act uses the language employed by the district court in the duration of registration section, *see* 15 U.S.C.

§ 1058, and the renewal of registration section, *see* 15 U.S.C. § 1059. Those sections speak of a showing that any "nonuse is due to special circumstances which excuse such nonuse and it is not due to any intention to abandon the mark." For a definition of abandonment, however, one must look to section 1127, that sets out the two requirements of discontinued use and an "intent not to resume."

6. *See Miller Brew. Co. v. Oland's Brew., Ltd.,* 548 F.2d 349 (Cust. & Pat.App.1976) (advertising beer, renewal of license to sell beer, offers to sell beer based on label approval or State Liquor Administration permission are evidence of intent to resume sales sufficient to rebut prima facie case of abandonment).

mercial use. Such a license is not permitted by the Lanham Act.[7]

## III. EXXON'S CLAIM UNDER § 1125

Exxon argues here that even if the HUMBLE mark were abandoned, Exxon has the right to prevent a competitor from gaining an unfair advantage by using a "false designation of origin" or "a false representation" in interstate commerce in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[8] The district court found that appellant Humble Exploration's use of the trade name Humble constituted a misrepresentation of goods and services in commerce in violation of § 1125(a). That conclusion flows from its finding that Exxon had not abandoned the HUMBLE mark. This court having found that Exxon has discontinued use of the mark, abandonment of the mark is yet to be

decided by the inquiry into intent to resume use. Whether the mark has been abandoned is in turn precedent to Exxon's claim under § 1125. That is, to the extent that Exxon travels on a trademark infringement claim, § 1125(a) is to be read in a parallel fashion with §§ 1114 and 1115.[9] While § 1125 has a broader reach than § 1114, and claims under it can be maintained by plaintiffs who are not owners of a trademark, *see Norman M. Morris Corp. v. Weinstein,* 466 F.2d 137 (5th Cir.1972), when a claim is based on alleged ownership of a mark, the two sections must be applied in a parallel manner. Otherwise stated, the § 1125 claim rises or falls on the issue of abandonment for the reason that the only basis for the trial court's holding that § 1125 was violated was the use by appellant of the mark, a use not faulted if the mark has been abandoned.[10] It would be

7. There have been few occasions that required a drawing of this distinction between an "intent to abandon" and an "intent not to resume use" because few cases have been bottomed solely on the Lanham Act.

The legislative history of the Act suggests that the "intent not to resume use" standard was adopted from the common law. *See Trademarks: Hearings on H.R. 82 Before the Subcomm. of the Committee on Patents,* 78th Cong., 2d Sess. 24 (1944) (statement of Daphne Robert, Member of Trademark Legislation Committee, American Bar Association). Common law cases preceding the adoption of the Act tended to use interchangeably the phrases an "intent not to abandon" with an "intent to resume." For example, in *Gold Seal Associates, Inc. v. Gold Seal Associates, Inc.,* 56 F.2d 452, 453 (S.D.N.Y.1932), the court observed: Here *no intent on the plaintiff's part to abandon* its business forever was made to appear. It had been forced by lack of funds to suspend the active prosecution of the business and such suspension had continued for about a year. But the proof already referred to shows convincingly that honest efforts were being made all along to revive the plaintiff and *to resume the business.* It cannot be said that the company had thrown away its name and whatever good will still clung to it. (emphasis added). *See also Recamier Mfg. Co. v. Harriet Hubbard Ayer, Inc.,* 59 F.2d 802, 807 (S.D.N.Y.1932). These cases did not, of course, address the situation of an alleged warehousing of marks. As we have emphasized, the statutory language of an "intent not to resume use" becomes important in this context and differs in a pivotal way from "intent to abandon."

8. Section 1125(a) provides:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

9. The court in *Matador Motor Inns, Inc. v. Matador Motel, Inc.,* 376 F.Supp. 385 (D.N.J. 1974), held that a statutory defense available under § 1115 also serves as a defense in a claim under § 1125(a).

10. One court has observed: "Standing to sue under § 43(a) is established if the plaintiff competes with defendant in the sale of goods covered by the term and *uses* or is *likely to use* the challenged mark." *Chromium Industries, Inc. v. Mirror Polishing and Plating Co.,* 448 F.Supp. 544, 555 (N.D.Ill.1978) (emphasis added).

incongruous to hold that Exxon had abandoned the mark, discontinued the mark with no intent to resume use, and thus that appellant had a right to use that mark because of Exxon's abandonment, *see P. Daussa Corp. v. Sutton Cosmetics Inc.*, 462 F.2d 134 (2d Cir.1972), and then to hold that appellant had engaged in false designation or representation of origin. Section 1125(a) "must still be read in the context of the statute in which it appears...." *General Pool Corp. v. Hallmark Pool Corp.*, 259 F.Supp. 383, 386 (N.D.Ill.1966).

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion. In doing so, we emphasize that we do not decide here whether the present record would support a finding that Exxon had sufficient intent to resume use of the Humble mark so as to avoid its loss, nor do we here address Exxon's rights under the common law to block any present use of the mark in a confusing manner. Finally, we leave to the trial court the decision whether additional evidence on the issue of intent to resume use ought to be heard.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.