EXXON CORPORATION, Humble Oil & Refining Corporation, Humble Gas Transmission Company and Humble Incorporated, Plaintiffs,

v.

HUMBLE EXPLORATION COMPANY, INC., Defendant.

No. CA–3–77–734–J.

United States District Court, N.D. Texas, Dallas Division.

Sept. 5, 1984.

Patrick F. McGowan, Strasburger & Price, Dallas, Tex., for plaintiffs.

William D. Harris, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

MARY LOU ROBINSON, District Judge.

*Introduction*

This case is before the Court on remand from the Fifth Circuit. See *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96 (5th Cir.1983). The background to this controversy is fully discussed in both the Fifth Circuit's opinion and this Court's earlier opinion, 524 F.Supp. 450 (N.D.Tex.1981) and will not be repeated here.

The initial issue before the Court is whether Exxon, during the years in which it did not make sufficient use of the HUMBLE trademark to avoid prima facie abandonment under the Lanham Act,[1] intended to resume use of the HUMBLE trademark. As the Fifth Circuit has said:

An "intent to resume" requires the trademark owner to have plans to resume commercial use of the mark.

·695 F.2d at 102. The Court conducted an evidentiary hearing on this issue on July 9, 1984, and this opinion constitutes the Court's Findings of Fact and Conclusions of Law.

*Exxon's Actions*

█ In 1972, the Board of Directors of the Humble Oil and Refining Company decided to replace the company's three primary regional trademarks, ESSO, ENCO and HUMBLE, with the single national trademark EXXON. The board passed the following resolution:

RESOLVED, That this Company change its primary product brand name, trademark and design mark to EXXON and designs associated therewith, substituting that brand name, trademark and associated design marks for the brand names, marks and associated designs the Company currently uses, that is, ESSO, ENCO and HUMBLE and their respective designs; provided, however, that Humble shall continue to use the ESSO, ENCO, and HUMBLE names, marks and designs in circumstances and ways other than as a primary brand name.

Despite this apparent intent to use the HUMBLE mark, the only actual use of the mark from mid-1974 to September 1, 1977, was arranged sales to targeted customers of a limited amount of product bearing both EXXON and HUMBLE marks; a use insufficient to avoid prima facie abandonment. 695 F.2d at 100.

---

1. The Lanham Act provides that:
 A mark shall be deemed to be "abandoned"—
 (a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.
 15 U.S.C. § 1127(a) (1982).

As early as March of 1973, however, Exxon's marketing department was concerned with protecting the three old regional marks "because even though [they] will be given less prominent use in the future, they continue to be valuable Company assets which must be protected and maintained." Px 14. Nonetheless, Exxon had decided to refrain from any use of the three regional marks for some period of time to prevent dilution of the new EXXON mark.

In June, 1974, Exxon's marketing department recognized the "need to protect [the three regional] trademarks in the major product lines such as automotive, retail heating oil, and industrial," and, correctly as it turned out, that "[t]oken shipments, such as we use for protection of inactive product brands, are insufficient to fight a case in court against a company which tries to appropriate one of the names." Px 23. The marketing department proposed several possible actions: (1) the use of small ESSO, ENCO, or HUMBLE ovals on the back of petroleum product cans, (2) the use of logos on the face of gasoline pumps, (3) the use of logos on maps, (4) the use of logos on oil burners sold by the company, and (5) establishing [tires, batteries and accessories] products which utilize these names in their brands. The marketing department noted that Exxon "must be sure that while these names are visible and can be used as evidence, they are not overpowering and do not contaminate the Exxon emblem." *Id.* None of these proposed actions were adopted by Exxon's board.

As part of the "coordinated program", Px 26, to protect ESSO, ENCO and HUMBLE, Exxon began to brand some products with ENCO and ESSO ovals in 1975. Px 30. No use for HUMBLE had yet been found, but on July 2, 1975, the marketing department recommended, inter alia, "[u]se [of] a small HUMBLE oval on drums of lubricants and specialties shipped from Baytown." *Id.* In September, 1975, Exxon's counsel expressed dissatisfaction with the July 2 proposals because they did "not include lines of business in which ... we

desire to maintain protection for these marks." Px 31.

No use of the HUMBLE mark other than the arranged sales was authorized until June 1, 1977, when Exxon decided to start stenciling HUMBLE ovals on the drums shipped from the Baytown refinery. This lawsuit, alleging trademark infringement, was filed the next day, June 2, 1977. HUMBLE ovals did not actually appear on any of the Baytown drums until September of 1977. During this period, the Baytown refinery was shipping approximately a quarter of a million drums per year to purchasers throughout the United States. Roughly 140 different products are shipped in the drums, which also bear EXXON marks. Photographs of the drum tops are reprinted in the Appendix.

Each employee who testified at the hearing said that Exxon intended, throughout the period of insufficient use, to resume use of the HUMBLE mark.

*Abandonment Cases: A Sampler*

Few courts have discussed the sort of evidence needed to show an intent to resume use of a trademark sufficient to rebut a prima facie case of abandonment through nonuse under the Lanham Act. In *Miller Brewing Co. v. Oland's Breweries,* 548 F.2d 349 (Cust. & Pat.App.1976), a trademark owner had not used its trademark for more than six years. The court found that this nonuse established a prima facie case of abandonment under § 1127, but that the evidence, taken as a whole, established an intent to resume commercial use. *Id.* at 351–52. It relied on two factors.

First, that the trademark's nonuse in the market was, in part, forced by "outside causes":

Oland & Son discontinued shipments of SCHOONER beer to the United States in November of 1968 for several business and economic reasons. Modernization of equipment to meet increasing demand caused financial difficulties. The new equipment could not handle the special nonreturnable bottles which had been used in shipments to the United States.

(Special labeling requirements in Massachusetts precluded use of the standard, compact, stubby bottle used by all Canadian brewers and necessitated use of a bottle with a longer neck.) A strike by employees of a competitor increased demand for SCHOONER beer in Canada.

*Id.* Here, no such "outside causes" prevented Exxon from using the HUMBLE mark.

Second, the court relied on the trademark owner's marketing attempts during the period of nonuse:

The evidence shows that even though shipments of SCHOONER beer to the United States had been discontinued, [the trademark owner], during the winter of 1971–72 through December of 1973, actively promoted the mark SCHOONER for its beer through advertising in tourist magazines distributed in the United States and/or on radio stations heard by listeners in the United States. The license to sell beer in Massachusetts was renewed in at least 1970 and 1971. On December 10, 1969, an offer was made to sell SCHOONER beer in the stubby Canadian bottles to a restaurant in Cambridge, Massachusetts, if label approval by the state could be worked out. At the same time, Oland & Son wrote a Boston beer distributor offering to supply SCHOONER beer in the stubby Canadian bottles, if the State Liquor Administration would permit.

*Id.* Here, Exxon made no attempt to market HUMBLE-branded products other than the arranged sales. No regulatory barriers limited Exxon's ability to use the HUMBLE mark.

Earlier, in *Sterling Brewers v. Schenley Industries,* 441 F.2d 675 (Cust. & Pat.App. 1971), the court found that a trademark owner who made no use of the mark for nine years had not abandoned the mark. After a strike had closed its brewery, the trademark owner decided not to reopen. *Id.* at 677. The court said:

The matter of whether the duration of the non-use and the attendant circumstances show legal intent not to resume use is more difficult. Nevertheless, we are satisfied that the facts of record negate the presumption of abandonment that arises from the non-use for more than two consecutive years. The continuous activity of [the trademark owner] directed to maintenance of the brewery during the period of non-use, coupled with the refusal to consider periodic efforts ... to negotiate purchase of the rights to the mark separately, demonstrates on intent to maintain conditions conducive to resumption of production under the mark on relatively short notice. There obviously was a continuing specific intent to preserve the capacity to transfer the right and ability to resume production of COOK's GOLDBLUME beer to a purchaser of the brewery assets.

*Id.* at 680. This holding is inconsistent with the plain language of § 1127(a). An intent to preserve the right to resume use of a trademark is mere warehousing and *not* an intent to resume commercial use. Here, Exxon had an intent to preserve its right to use the HUMBLE mark, but this does not answer the ultimate question of whether Exxon intended to resume commercial use of the HUMBLE mark.

Although the Court of Customs and Patent Appeals has rarely found a mark abandoned under § 1127(a)[2], other courts have more readily found abandonment, even of famous marks. For example, in *I.H.T. Corp. v. Saffir Pub. Corp.,* 444 F.Supp. 185, 189 (S.D.N.Y.1978), the court found that 12 years nonuse of the mark NEW YORK HERALD TRIBUNE coupled with no contemplated revival of the paper or future plans for use of the mark, beyond an abstract desire to resume use at some

---

**2.** *See, e.g., Wallpaper Manufacturers v. Crown Wallcovering Corp.,* 214 U.S.P.Q. 327 (Cust. & Pat.App.1982); *P.A.B. Produits et Appareils v. Satinine Societa,* 570 F.2d 328 (Cust. & Pat.App. 1978); *Miller Brewing, supra; American Lava* *Corp. v. Multronics, Inc.,* 461 F.2d 836 (Cust. & Pat.App.1972); *Sterling Brewers, supra; Guiding Eyes for the Blind v. Guide Dog Foundation for the Blind,* 384 F.2d 1016 (Cust. & Pat.App.1967).

indefinite time in the future, strongly suggested abandonment.

In *American Photographic Pub. Co. v. Ziff-Davis Pub. Co.*, 135 F.2d 569, 573 (7th Cir.1943), the only use of the mark POPULAR PHOTOGRAPHY by the magazine *American Photography* for the preceding 20 years had been to reprint the mark in the masthead of *American Photography* along with the titles of 12 other magazines American Photography had acquired over the years. The court held the trademark abandoned:

> The names of the periodicals listed under *American Photography* do not even purport, however, to represent existing publications. Commercially they are dead.... Like epitaphs on the tombstones in the family burial plot, they reflect an honored past; but their present function is merely to describe the history and background of *American Photography.*

*Id.* at 572. In response to the magazine's argument that it intended to resume commercial use of the mark at some point in the future, the Seventh Circuit said:

> [T]he purely subjective intention in the abandoner's mind to re-engage in a former enterprise at some indefinite future time is not sufficient to avoid abandonment where an objective analysis of the situation furnishes ample evidence to warrant the inference of abandonment.

*Id.* at 573.

### Discussion

As this sampler of abandonment cases indicates, the most that can be said to reconcile the conflicts in the cases is that each case is founded on its own facts. Unlike *Miller Brewing* and *Sterling Brewers*, Exxon's nonuse of the HUMBLE mark was not forced by "outside causes." Unlike the HERALD TRIBUNE case, Exxon contemplated some future use of HUMBLE and had the present capacity to use it. Unlike *American Photographic*, the HUMBLE mark is not commercially dead.

Resolution of this case requires the nonuse of HUMBLE to be considered in the context of Exxon's overall trademark situation. As discussed in the previous opinions, Humble had labored for decades behind three sharply limited regional trademarks. When EXXON was adopted, Humble wanted a clean break from the regional marks and virtually obliterated them from the American marketplace.

■ Nevertheless, Exxon's marketing department developed proposals for using all three regional marks. ESSO and ENCO were placed back in use through the efforts of the marketing department. HUMBLE was placed back in use after roughly three years of nonuse. The June, 1974, and July, 1975, memorandums, Pxs 23 & 30, show Exxon's intent to make more than token use of HUMBLE. The very strength of the HUMBLE mark made it difficult to find a use for HUMBLE which would not contaminate the EXXON mark.[3] The Court finds that, during the period of nonuse, Exxon did not have an intent not to resume use of the HUMBLE mark and, further, that Exxon intended to resume commercial use of HUMBLE.

---

**3.** The defendant argues that even if Exxon intended, during the period of nonuse, to begin stenciling HUMBLE on the Baytown barrel, this intent is inadequate to avoid abandonment because the HUMBLE stencil on the Baytown barrels is not a commercial use of the mark. The real mark on the barrels, defendant asserts, is the more prominent EXXON mark.

Of course, "the fact that a product bears more than one mark does not mean that each cannot be a valid trademark." *Old Dutch Foods v. Dan Dee Pretzel & Potato Chip Co.*, 477 F.2d 150, 154 (6th Cir.1973). Each mark must, however, be a bona fide mark. *Blue Bell, Inc. v. Farah Mfg.*

*Co.*, 508 F.2d 1260, 1267 (5th Cir.1975). The Fifth Circuit's opinion in this case noted that "[t]he question is whether the mark's role is real or fictional." 695 F.2d at 100 n. 3. The Court need not answer this question to resolve this case.

The question here is whether Exxon intended to resume commercial use of the HUMBLE mark. The answer is yes. That the first actual use made of the mark may have been noncommercial is not dispositive of the intent issue. It is, instead, simply another piece of evidence bearing on the ultimate issue of intent.

*Conclusion*

▮ The Court concludes that the plaintiffs have not abandoned their rights in the HUMBLE mark. Based on this Court's earlier Findings of Fact and Conclusions of Law, 524 F.Supp. 450–67, and this memorandum, it is hereby ORDERED that the Defendant's use of Humble as a trade name in connection with its activities be, and hereby is, enjoined.

APPENDIX