AKelley
Paper No. 27

FOR PUBLICATION IN FULL

## U.S. DEPARTMENT OF COMMERCE
## PATENT AND TRADEMARK OFFICE

Trademark Trial and Appeal Board

Continental Grain Company
v.
Strongheart Products, Inc.

Cancellation No. 15,875 and
Cancellation No. 15,898

John M. Mann, Dennis M. McWilliams, Anthony S. Zummer and James R.
Sweeney for Continental Grain Company.

Kokjer, Kircher, Bradley, Wharton, Bowman & Johnson for
Strongheart Products, Inc.

Before Simms, Krugman and Hanak, Members.

Opinion by Simms, Member:

Continental Grain Company has petitioned to cancel the
registrations held by Strongheart Products, Inc., by assignment,
of the mark KIT KAT for canned cat food, consisting of fresh fish,

cracked wheat, soya bean meal and salt.[1]   In the complaints,
petitioner asserts that it owns applications to register the marks
KIT KAT GROW (Serial No. 593,611, filed April 14, 1986) and KIT
KAT GLOW (Serial No. 593,463, filed April 14, 1986), both for
animal feed; that petitioner has used these marks since at least
February 12, 1986; that its applications to register have been
refused on the basis of the registrations sought to be
cancelled;[2] that respondent does not use the registered marks
and has therefore abandoned them; and that petitioner therefore
has superior rights.  Respondent has denied the essential
allegations of the petition but has admitted that its
registrations have prevented petitioner from registering its
marks.

The record of this case consists of the registration
files, discovery depositions taken and relied upon by petitioner,
and petitioner's testimony (and exhibits).  Respondent has taken
no testimony or offered any other evidence in its behalf and has
not filed a brief.

---

[1] Supplemental Register Registration No. 582,367, issued November
10, 1953, Section 8 affidavit accepted, renewed; and Principal
Register Registration No. 646,190, issued May 28, 1957 pursuant to
Section 2(f), Sections 8 and 15 affidavits filed, renewed.  In the
second registration, the description of goods was amended simply
to cat food.  Although these cancellation proceedings have never
been consolidated, they present the same issue on the same record.
We shall treat them in one opinion.

[2] According to petitioner's brief, the Examining Attorney
handling these applications has suspended action pending the
outcome of these cancellation proceedings.

There is no question that petitioner, a manufacturer of pet food, whose applications have been refused registration by virtue of respondent's registrations, has standing to be heard on the question of cancellation of that registration. Lipton Industries, Inc. v. Ralston Purina Company, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). Accordingly, the only issue before us is whether petitioner has established that respondent has abandoned any rights it may have had in the registered marks. Before discussing this issue, however, a brief summary of petitioner's adoption and use of its pleaded marks is in order.

In late 1985, petitioner decided to introduce two new cat foods, KIT KAT GROW for kittens and KIT KAT GLOW for other cats. Petitioner had a trademark search conducted to determine the availability of these marks, both intended to be a play on the word tic-tac-toe. That search disclosed registrations of the mark KIT KAT for canned cat food held by respondent. According to petitioner's testimony, petitioner was not previously aware of this mark. Ms. Kathleen Updyke, the marketing services manager of the Wayne Pet Food Division of petitioner, under the guise of being a consumer interested in purchasing this brand of cat food, called Mr. Jon Dahlquist, now respondent's plant manager, in Kansas City, Kansas. Upon inquiry, she was told that respondent had not sold KIT KAT cat food for 15 years and that only STRONGHEART brand cat food was being sold (Updyke dep., 8).

3

Having made the determination that respondent had abandoned any trademark rights in the mark KIT KAT, petitioner introduces its KIT KAT GROW and KIT KAT GLOW cat food in February 1986. Full-scale production was commenced in July 1986. Sold in boxes and bags, petitioner's cat food has reaped over $1 million in gross sales and petitioner has spent around $400,000 in advertising and promoting the products under the marks.

With respect to the issue of abandonment, while the testimony reveals that KIT KAT cat food was a "big item" for respondent's predecessor in the late 1960s and early 1970s, after 1974 the product was shipped only on a very limited basis in an attempt to maintain rights in the mark. As the following testimony indicates, only one recent shipment was made since respondent was acquired by new owners in December 1985. That shipment of minimal quantities of KIT KAT cat food (1 case of each flavor totaling $20.00) took place in November 1986, after the instant petition was filed.

Q.60    And you are still there. What has been
        the history of the Kit Kat cat food
        from 1974 up to 1985?

A.      [By Jon Dahlquist] Okay. The Kansas
        City plant has not manufactured any pet
        food, either cat or dog in that size
        can, since 1974.

Q.61    This is the 6-ounce can?

A       This is the 6-ounce can.

Q.62    Just so I'm clear on this, the 6-ounce
        can of pet food would be the one that
        was labeled with the Kit Kat label?

A.    That's correct.

Q.63  No other size can?

A.    That's correct.

Q.64  And 6-ounce cans of pet food were not
      manufactured by the Strongheart Kansas
      City plant from '74 to '85?

A.    That's correct.

Q.65  Do you know whether or not 6-ounce cans
      of pet food were manufactured anywhere
      else?

A.    Yes, I do.

Q.66  Can you tell me about that?

A.    6-ounce cans are or were manufactured
      in the Momence facility.

Q.67  Momence, Illinois?

A.    Momence, Illinois.

Q.68  And do you know what labels were put on
      the 6-ounce cans by the Momence,
      Illinois plant?

A.    Kit Kat.

Q.69  And we're covering the entire period of
      '74 to '85 now?

A.    That's correct.

Q.70  Can you give me some idea of the
      quantities that were manufactured of
      Kit Kat cat food by Momence?

A.    They manufactured approximately twenty
      cases for this particular order and I'm
      referring to Exhibit 1.

5

Q.71 Okay.

A. Your Exhibit 1.

Q.72 Yes. You've lost me now.

A. Okay.

Q.73 They manufactured approximately twenty cases, this would have been a manufacturing taking place in 1986?

A. Yes.

Q.74 Okay. All right. Let me focus you back to '74 when you come back to Kansas City, Kansas Strongheart Products plant up until 1985, December 13th, when the sale takes place, what were the manufacturing and sales of the Kit Kat cat food during that eleven-year period?

A. The--I cannot give you specific instances of when Kit Kat was sold. The equipment was in place, most of the equipment was in place in Momence to be able to run. It was standard policy from Edwin, which we've carried--Mr. Vick, which we have carried on through the years to periodically make a small quantity and ship it. We had started to get into it back in '83, '82, '83.

Q.75 You say you started to get into it, what is it?

A. 6-ounce can manufacturing and sales.

Q.76 Would that be KIT KAT brand cat food in 6-ounce cans?

A. That's correct.

Q.77   Okay.

A.     The idea was that we could bring back
       our label because the sales of cat food
       was picking up, as an industry-wide
       happened, we could manufacture Kit Kat
       and sell it ourselves, plus we could
       also do some private labeling for other
       people.

Ms. Clara Roberdes, respondent's controller, corroborated

this testimony, at 6, 10:

Q.18   (By Mr. Sweeney)  What I'm looking for
       is records of sales of Kit Kat cat
       food, and we've sort of pinned it down
       to 197--early 1974 to date.  Can you
       tell me what you remember about sales
       of Kit Kat brand cat food over that
       period?

A.     We stopped making it in Kansas City,
       but I don't know the year, you know,
       but then we made it for several years,
       more in Chicago in our Momence plant
       and as the sales declined, and cat food
       sales did decline, then we stopped
       making it and we would make it to keep
       the record alive, that's about it.  And
       now we've started again, I guess,
       trying to check it out.

                  *  *  *  *  *

Q.43   ... We've had testimony that there were
       periodic runs of Kit Kat cat food
       probably on an annual basis.

A.     Once a year.

With respect to the specific volume of respondent's once-

a-year token shipments, it is difficult to determine the amounts

sold.  Mr. Polster, respondent's vice president, indicated in his

discovery deposition that the sales were similar in nature to the November 1986 transaction (p. 36). Mr. Dahlquist's testimony (pp. 21-22), while somewhat vague, would tend to support a larger number of cases sold once a year.

Except for the invoice of the November 19, 1986 sale, the testimony indicates that most of respondent's records were destroyed in the process of consolidating accounting systems with the home offices of Swift and Company in Chicago in the early 1980s. In sum, respondent has not commercially produced its KIT KAT cat food products since 1974, except for annual token sales for the admitted purpose of maintaining its trademark rights. Respondent has no records of these annual sales (except for the November 1986 invoice and bill of lading). As noted above, respondent has failed to take any testimony or to file a brief.

We believe that petitioner has demonstrated that respondent has abandoned its trademark rights and that respondent's nominal use of its trademark on annual shipments of cat food for the past 14 years is insufficient to rebut the prima facie case of abandonment due to nonuse for over two consecutive years. See Exxon Corp. v. Humble Exploration Co., Inc., 695 F.2d 96, 99, 217 USPQ 1200, 1202-1204 (5th Cir. 1983), reh. denied, 701 F.2d 173 (periodic sales of nominal amounts are not sufficient uses to avoid a prima facie proof of abandonment; Lanham Act does not allow the preservation of a mark solely to prevent use by

others), La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc., 495 F.2d 1265, 181 USPQ 545, 549 (2d Cir. 1974) (89 perfume bottles sold over a 20-year period constitute sporadic and nominal usage intended solely for trademark maintenance purposes and are not good faith commercial exploitation), Procter & Gamble Co. v. Johnson & Johnson, Inc., 485 F.Supp. 1185, 205 USPQ 697, 715-716 (S.D.N.Y. 1979), aff'd without opinion, 636 F.2d 1203 (2d Cir. 1980) (shipment of 50 cases a year are nominal and do not represent placement on the market in a meaningful way or a bona fide attempt to establish a trade or commercial use), CarX Service Systems, Inc. v. Exxon Corp., 215 USPQ 345, 353 (TTAB 1982) (token shipments for a trademark maintenance program are inadequate), Lever Brothers Co. v. Shacklee Corporation, 214 USPQ 654 (TTAB 1982) (sales of $10.40 over 4 years are sporadic non-commercial token sales), Pet Inc. v. Bassetti, 219 USPQ 911 (TTAB 1983) (rights not established or maintained by sporadic, nominal shipments interspersed with long periods of inactivity), Feed Flavors Inc. v. Kemin Industries, Inc., 214 USPQ 360, 364 (TTAB 1982), Block Drug Co., Inc. v. Morton-Norwich Products, Inc., 202 USPQ 157, 159 (TTAB 1979) (while a simple bona fide use may be sufficient to secure a registration, more is required to sustain a mark against a charge of nonuse; once-a-month trademark maintenance shipments were held not a bona fide commercial use),

9

and Clairol, Inc. v. Holland Hall Products, Inc., 165 USPQ 214 (TTAB 1970) (token monthly shipments), and cases cited therein. In accordance with this authority, we believe that respondent's defensive token use was insufficient to maintain its rights and that respondent has otherwise failed to rebut petitioner's proof by a showing of intent to resume use or by a showing of excusable nonuse. At best, respondent's potential commercial use in the future is speculative and remote and does not constitute an intent to resume use. See Polston dep., 16, Procter & Gamble, supra, at 716 and Hamilton Burr Publishing Co. v. E. W. Communication, Inc., 216 USPQ 802, 807 (TTAB 1982).

Decision: The petitions for cancellation are granted and respondent's registrations will be cancelled in due course.

R. L. Simms

G. D. Krugman

E. W. Hanak
Members, Trademark
Trial and Appeal Board

NOV 4 1988